**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

PETER J. H.,[1]

Plaintiff,

v. Action No. 2:22cv487

KILOLO KIJAKAZI,
Acting Commissioner of Social Security,

Defendant.

## UNITED STATES MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Peter J. H. ("plaintiff") filed this action for review of a decision by the Commissioner ("Commissioner") of the Social Security Administration ("SSA") denying his claim for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act. *See* 42 U.S.C. §§ 405(g), 1383(c)(3).

An order of reference assigned this matter to the undersigned. ECF No. 7. It is recommended that plaintiff's motion for summary judgment (ECF No. 9) be **GRANTED**, and the Commissioner's motion for summary judgment (ECF No. 11) be **DENIED**.

[1] In accordance with a committee recommendation of the Judicial Conference, plaintiff's last name has been redacted for privacy reasons. Comm. on Ct. Admin. & Case Mgmt. Jud. Conf. U.S., Privacy Concern Regarding Social Security and Immigration Opinions 3 (2018).

## I. PROCEDURAL BACKGROUND

Plaintiff protectively filed a Title II application for a period of disability and disability benefits on April 16, 2020, alleging he become disabled on November 1, 2019. R. 191–97.[2] Plaintiff alleges disability for degenerative disc disease, status-post cervical spine fusion, carpal tunnel syndrome, lupus, hepatitis C, depression, and anxiety. R. 102, 220. Following the state agency's denial of his claim, both initial and upon reconsideration, R. 102–12, 115–18, plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), R. 121–22. ALJ Mary Ann Poulose held a telephonic hearing on December 2, 2021, and issued a decision denying benefits on January 24, 2022. R. 12–64. The Appeals Council denied plaintiff's request for a review of the ALJ's decision. R. 1–3. Therefore, ALJ Poulose's decision stands as the final decision of the Commissioner for purposes of judicial review. *See* 42 U.S.C. §§ 405(h), 1383(c)(3); 20 C.F.R. § 404.981.

Having exhausted administrative remedies, plaintiff filed a complaint on November 22, 2022. ECF No. 1. The Commissioner answered on January 23, 2023. ECF No. 5. In response to the Court's order, plaintiff and the Commissioner filed motions for summary judgment, with supporting memoranda, on February 16 and March 17, 2023, respectively. ECF Nos. 9–12. Plaintiff replied to the Commissioner's motion on March 31, 2023. ECF No. 13. The Court granted the Commissioner's motion for leave to file a sur-reply, ECF No. 16, which was filed on April 6, 2023, ECF No. 17. As no special circumstances exist that require oral argument, the case is deemed submitted for a decision.

---

[2] Page citations are to the administrative record that the Commissioner previously filed with the Court.

## II. RELEVANT FACTUAL BACKGROUND

### *A. Background Information and Hearing Testimony by Plaintiff*

At a hearing before the ALJ on December 2, 2021, plaintiff provided the following information. At the time, the 59-year-old plaintiff lived alone in an apartment. R. 35, 37. Plaintiff attended a "musical training school" but did not finish high school. R. 38. Plaintiff worked at Chick-fil-A for ten years but had to stop working one month before the hearing because he was struggling to perform the job. R. 38–40. Plaintiff stated that his depression along with his inability to frequently lift and carry items caused him to stop working. R. 38. Plaintiff testified that he would do "pretty much anything" at Chick-fil-A, including making lemonade and sweet tea, bring ice to the counters, work the front counter, lift 30 to 50 pounds, and walk to deliver food to people in the parking lot. R. 39–40, 55. During a four-hour shift he would have to sit down at least once or twice due to his depression, panic attacks, and back pain. R. 55–56.

Plaintiff testified that he had two surgeries. R. 40–43. The first was a cervical spine fusion surgery. R. 40–41. Plaintiff stated that he felt better than before the surgery and it was not until after a second operation that his health started to "degenerate again." R. 41. During the second operation in 2019, which was performed to fix complications from plaintiff's first surgery, R. 365–66, he "almost died," and had to stay in the intensive care for "about five or six days," R. 41. After the second surgery, plaintiff did rehabilitation exercises with his friend for two and a half months. R. 42. Plaintiff also received chiropractic care for some time but thought it was making him worse. R. 51. Plaintiff stated that when he went back to work after the surgeries it was both emotionally and physically difficult. R. 42–43. He testified that his physical capabilities, like his grip strength and ability to lift, had declined. R. 43.

On a typical day plaintiff cooks himself breakfast, does stretching exercises, reads, goes outside, walks around the parking lot, plays guitar, studies music, watches TV, talks to a friend, lays down, and takes a shower. R. 44–45. He drives but is afraid to get on the freeway because he must turn his head often, which causes him problems. R. 43. A friend often drives him places, like to doctors' appointments. R. 45. Plaintiff stated that he does not need help getting dressed or bathed but he is "very cautious in the shower." *Id.* He also has some trouble cleaning, but can do some vacuuming, washing dishes, and laundry. R. 45–46. Plaintiff struggles to remember and understand and can only read one page of a book in one sitting. R. 46. He also can only play his guitar for half an hour at a time because he "still struggl[es]" with his shoulder and neck. R. 47. Plaintiff testified that he does not usually grocery shop and when he does, he has a friend take him. *Id.* Plaintiff attends AA meetings and, as of the time of the hearing, plaintiff's last drink was a month earlier. R. 49–50.

When discussing his abilities, plaintiff stated the following: (1) he could lift a case of water bottles, but he would "hesitate to bring it back upstairs once [he] got home"; (2) he could carry a gallon of water; (3) he limits leaning forward, such as doing dishes, because of back, neck, and shoulder pain; (4) he could reach and grab something at shoulder height, but may have difficulties depending on how far he has to reach; (5) he can sit in a chair upright if it's cushioned; (6) he can go up and down the stairs but has to hold the rail; and (7) he can squat down to pick something off the ground but cannot bend over. R. 47–49, 51–53. He stated that he always experiences pain of varying degrees. R. 58. Plaintiff also struggles to sleep and experiences fatigue throughout the day. *Id.* Although plaintiff discussed his depression, he is not currently in therapy. R. 50–51. Plaintiff states that he is "very moody" and will "invite somebody over" but then "won't answer the door." R. 54.

Plaintiff's May 2020 work history report and function report contain similar information. R. 242–66. In plaintiff's work history report, he described his job duties at Chick-fil-A and stated that he would work the front counter, wash dishes, make lemonade, take out the trash, carry buckets of ice, pour tea and lemonade into large containers, and wash appliances. R. 244. In his function report, plaintiff explained that he has trouble putting on his shoes, is nervous about slipping when he bathes, struggles to care for his hair, uses a microwave to heat food, experiences pain when using the bathroom because of his lower back and neck, and sometimes walks with a cane. R. 257. Plaintiff also does laundry, makes the bed, and vacuums once a week. R. 258. He reported that his medications decrease his appetite, make him tired and dizzy, and affect his mood. R. 258, 266. Plaintiff stated that he can only walk "about a block" before he must stop and rest for a few minutes. R. 263. He also revealed that he does not follow written instructions well but can follow spoken instructions. *Id.* Plaintiff further revealed that he has "respect for everybody," does not handle stress well, and tries to adapt to changes in routine. R. 265.

***B. Hearing Testimony by Vocational Expert***

Thomas Grzesik, a vocational expert ("VE"), testified at the hearing. R. 59–62. Based on the ALJ's hypotheticals, VE Grzesik found that someone with plaintiff's age, education, work history, and residual functional capacity ("RFC") could perform plaintiff's past relevant work ("PRW") as a fast-foods worker. R. 60–61. VE Grzesik stated that a "fast-foods worker" (Dictionary of Occupational Titles ("DOT") number 311.472-020[3]) was "light in physical demand per DOT, medium as performed," and unskilled. *Id.* VE Grzesik further testified that a person with only occasional shoulder height reaching could perform the job as a fast-foods worker but if

[3] As pointed out by plaintiff, and conceded by the Commissioner, DOT 311.472-020 does not exist. ECF No. 10, at 7 n.3; ECF No. 12, at 5 n.2. That said, the ALJ corrects this mistake in her decision citing to DOT 311.472-010. R. 24.

a person could perform no overhead reaching then the work would be precluded. R. 61. To maintain employment as a fast-foods worker, VE Grzesik stated that a person could not be off task more than ten percent of the time and have no more than six absences per year. R. 62.

### *C. Relevant Medical Record*

#### **1. Health Record**

##### **a. Sentara Healthcare**

Prior to the alleged disability onset date, plaintiff sought treatment for his alcohol abuse and mental health. R. 641–49 (presenting at Sentara Virginia Beach emergency department on June 8, 2017, with alcohol abuse and anxiety). He also sought treatment for his hand numbness, soreness, and weakness. R. 321 (presenting at Sentara Virginia Beach General on November 27, 2017, describing pain as dull yet burning at times and that he sleeps with braces). Plaintiff received an MRI on his right shoulder on December 13, 2018, which revealed "[p]artial thickness articular sided tears," "[a]bnormal findings within the rotator cuff," "[f]ocal type 1 SLAP lesion," and "[m]ild degenerative osteoarthropathy." R. 355, 432–33. Plaintiff received an MRI of his cervical spine on January 10, 2019, which showed "diffuse degenerative changes," "[c]entral stenosis with very mild cord flattening maximal at C4-C5," "[n]o cord signal change and this would not with confidence correlate with a cervical myelopathy," and "[m]ultilevel severe bilateral neural foramen stenosis from C4 through T1." R. 430–31.

On April 5, 2019, about seven months prior to his alleged onset date, plaintiff had spinal fusion surgery at Sentara Princess Anne Hospital for his cervical spondylosis with radiculopathy. R. 610, 618–19. Plaintiff denied any issues immediately following surgery and had significant improvement in symptoms. R. 621, 624. Plaintiff was discharged the next day. R. 623.

On April 12, 2019, plaintiff presented at Sentara Virginia Beach Hospital emergency department with a "neck hematoma, neck infection, airway compromise, tracheal shift, [and] retropharyngeal abscess." R. 365. His symptoms included trouble swallowing, hoarseness, and swelling on the front of his neck. R. 427. These symptoms appeared to accompany complications from his spinal fusion performed on April 5, 2019. R. 366. Plaintiff was then transferred and admitted to Sentara Princess Anne Hospital where he was "kept intubated overnight." R. 381, 547. Plaintiff's hematoma was operated on and removed without complication. R. 554. Plaintiff's "pain [was] well controlled with oral meds" and he was discharged on April 17, 2019. R. 381, 604.

Approximately one month later, on May 17, 2019, plaintiff presented at Sentara Virginia Beach General Hospital with ongoing neck and back pain. R. 532–33. He was out of pain medication and plaintiff stated that his pain was "difficult to tolerate." R. 532. He described the pain as "achy, sharp at times, and moderate to severe." R. 533. Plaintiff was medicated and then discharged the same day. R. 536.

Approximately four months after his alleged onset date of November 1, 2019, on March 6, 2020, plaintiff presented at Sentara Virginia Beach General Hospital with multiple complaints. R. 516. He complained of "shortness of breath" and reported that he was "stressed because of his drinking and his girlfriend." R. 518. Plaintiff also reported a "history of chronic pain from the cervical fusion that he had 10 months ago" and that he relapsed after two years of sobriety. *Id.* Plaintiff was positive for depression but negative for suicidal ideas and hallucinations. *Id.* Plaintiff refused inpatient admission for detoxification because he couldn't afford to stay in the hospital and "needs to get back to work in order to cover bills." R. 525. Plaintiff was discharged the same day. R. 925.

The next day, plaintiff again presented at Sentara Virginia Beach General Hospital emergency department with "[a]lcohol dependence with intoxication with complication." R. 483. Plaintiff reported "significant alcohol use" and went to the hospital due to "physical discomfort from him attempting to detox himself." R. 484, 489. During plaintiff's previous visit he was given Librium to take home but he "continued drinking" and the medication made him shaky. R. 484. His physical exam revealed that he was "anxious with a flat [a]ffect" and had "mild tremulous," but he ambulated without difficultly and had full range of motion in his neck. R. 486. Plaintiff reported "anhedonia, disturbance in sleep and appetite, poor focus and concentration, hopeless[ness] and helpless[ness]." R. 489. Plaintiff attended a substance abuse program 3 years earlier and attempted suicide 18 years earlier. *Id.* His mental status exam revealed that he was neat, clean, alert, cooperative, and restless, had poor concentration, had logical thought content, had a depressed and anxious mood, had a blunted, flat, and sad affect, a decrease in appetite, poor judgment and insight, intact recent and remote memory, and loss of energy. R. 490. While in the hospital, plaintiff refused to attend group therapy. R. 495. Although plaintiff was encouraged during his psychotherapy session to stay in the hospital to complete a detoxification protocol, he stated that he "did all [his] detoxing downstairs in the ER when [he] was there for 2 days." R. 496. Plaintiff elected to leave against medical advice on March 9, 2020. R. 509–10; *see also* R. 509 ("The patient understands the risks associated with leaving the hospital against medical advice . . . [and] [t]he patient appears to have no evidence of psychiatric impairment and demonstrates an appropriate level of capacity and insight for decision making.").

On May 27, 2020, plaintiff presented at Sentara Virginia Beach General Hospital requesting to detox from alcohol. R. 833. Plaintiff admitted to "depression and feeling very lost" and "overwhelmed by [h]ealth issues." R. 834, 839. Plaintiff also stated that he never got sober

after his hospital visit in March. R. 834. He did not have any suicidal thoughts or hallucinations, but he appeared nervous and anxious. *Id.* His mental status examination revealed he was cooperative, had fair insight, had no overt psychosis, had a flat/sad affect, and depressed mood. R. 841; R. 849 ("[Plaintiff] describ[ing] some mild depression but mainly in context of inability to maintain sobriety."). Plaintiff had severe anxiety in the context of severe alcohol withdrawals. R. 849. While in the hospital, plaintiff actively participated in a few group therapy sessions but declined to attend others. R. 856–57, 862, 866, 871, 879–80. After being in the hospital for two days, plaintiff reported that the withdrawal symptoms were improving and his anxiety was subsiding, but he still felt "unhappiness." R. 858. His mental status examination on May 29, 2020, revealed that his mood was congruent and blunted, his thought process was well formed, his attention and concentration were intact, his insight and judgment were improving, his memory was intact, his gait was normal, and he had a significant tremor. R. 860. Plaintiff was discharged on May 30, 2020. R. 872; R. 876 ("He really wants to leave. His withdrawal symptoms are much improved compared to yesterday."); R. 979 (discussing that plaintiff was "nervous about discharging to [sic] soon"). Upon discharge, it was recommended that plaintiff go to "AA at least on a daily basis." R. 873. At discharge, his "level of risk" was "high due to active and severe alcohol withdrawals," as well as his "[l]imited capacity to cope with ongoing psychosocial stressors." R. 1089. Plaintiff did, however, note that he was feeling "slightly better," and his anxiety was subsiding. *Id.*

**b. Virginia Beach Psychiatric Center**

Plaintiff was admitted to Virginia Beach Psychiatric Center from June 1, 2020 to June 4, 2020 for alcohol abuse. R. 1013. Plaintiff stated that he drinks about two bottles of wine a day, and his withdrawal symptoms include "sweating, shaking, tremor, anxiety, depressed mood,

irritability, and decreased appetite." *Id.* Further, "[c]onsequences of his alcohol abuse include decreased self respect, job loss and relationship difficulties." *Id.* He had one prior admission at Virginia Beach Psychiatric Center but "no documentation could be located." *Id.* A mental status examination revealed that plaintiff was appropriately dressed and groomed, was anxious and uncomfortable, was orientated to person, place, and situation, had goal-directed and linear thoughts, had no hallucinations, had one previous delusion of seeing the floor move that was worse with withdrawal from alcohol, his speech was regular, his memory was intact, and his judgment was impaired secondary to withdrawal. R. 1014. Plaintiff's physical exam revealed "low back pain, systemic lupus erythematosus, fatigue and insomnia." R. 1015. Plaintiff was expected "to have significant and prompt improvement of the acute presenting psychiatric symptoms during th[e] hospitalization." R. 1019. Upon discharge, plaintiff "was able to tolerate an induction to naltrexone with Vivitrol intramuscular injection," and he was continued on gabapentin. R. 1015.

**c. David L. Werwath, M.D.**

Throughout 2019 plaintiff was seen by David L. Werwath, M.D., for medication refills for alcoholism, anxiety, and cervical spondylosis. R. 1236–46. On May 22, 2019, plaintiff reported that he "ran out of oxycodone and pain was severe." R. 1245. On November 21, 2019, plaintiff stated that his alcoholism and chronic neck pain were managed well with tramadol and gabapentin. R. 1238. And, plaintiff stated that "life is going well." *Id.*

In 2020, plaintiff kept seeing Dr. Werwath for alcoholism, anxiety, and cervical spondylosis. R. 1070. On September 3, 2020, plaintiff was seen for medication refills for Tramadol and Neurotin because he had "been out of both medications for a couple of months." *Id.* Plaintiff's physical exam revealed that his affect was flat, but no other abnormalities were noted. *Id.*

On September 25, 2020, plaintiff was seen for depression. R. 1066. Plaintiff's reported that his depression continued "since relapsing recently and [his] girlfriend breaking up with him." R. 1067. Plaintiff had good judgment, normal mood and affect, was alert, was oriented to time, place, and person, and his recent and remote memory were normal. *Id.* On December 3, 2020, plaintiff was again seen for a medication refill for alcoholism and depression. R. 1064. Plaintiff was taking Zoloft and gabapentin and he discontinued taking his medications several weeks prior to his visit. *Id.* Plaintiff reported an increase of depressive thoughts, lack of motivation, and an overall decline in mental health since he stopped taking his medications. *Id.* Plaintiff was prescribed Trintellix and gabapentin. R. 1065. On December 22, 2020, plaintiff was seen by Dr. Werwath and plaintiff was healthy-appearing and ambulating normally. R. 1059. He had good judgment, normal mood and affect, and his recent and remote memory were normal. *Id.* His physical examination was normal. *Id.*

On March 4, 2021, plaintiff was seen by Dr. Werwath for rectal bleeding. R. 1153. Plaintiff also expressed his desire to "start back" on medication for depression. R. 1155. Plaintiff's physical exam revealed that he was ambulating normally, had good judgment, had a normal mood and affect, he was alert, and orientated to time, place, and person. *Id.* Zoloft was prescribed and a psychotherapy referral was given. R. 1157.

Two months later, on May 14, 2021, plaintiff was seen by Dr. Werwath for a medication refill. R. 1150. Defendant appeared healthy and "overweight." R. 1151. Plaintiff's mental status examination was normal, and he was ambulating normally, his motor strength and tone were normal, and his gait and station were normal. *Id.*

**2. Consultative Examinations—August 2020**

**a. Internal Medicine Examination—Leo M. Bailey II, D.O.**

On August 16, 2020, Leo M. Bailey, II, D.O., performed a consultative examination on plaintiff. R. 1041–46. Dr. Bailey reviewed plaintiff's family history, work history, medical history, symptoms, and current medications. R. 1041–42.

Plaintiff reported a history of anxiety, depression, and manic episodes—for which he was receiving psychiatric counseling at the time of the examination. R. 1041. Plaintiff stated that poor mental health causes lack of motivation, panic attacks, night terrors, and difficulty sleeping and it affects "his ability to work secondary to difficulty regulating emotions." *Id.*

As for medical history, plaintiff stated that he has joint and neck problems as well as lupus and hepatitis C. R. 1041–42. He detailed his 2018 C-spine fusion surgery and his subsequent physical therapy that "did not help" and later scans that apparently showed a collapsed disc. R. 1041. He described his pain as "burning" and that his symptoms include "occasional numbness and tingling in his hands bilaterally, dizziness, shortness of breath, and pain." *Id.* He reported that the pain is worse with activity, lifting, and playing the guitar and is better when he takes medication, uses heat and ice packs, and rests. *Id.* Plaintiff reported his functional limitations as "sitting 2 hours, standing 3 to 5 minutes, walking 1 block, and lifting 20 to 40 pounds." *Id.* Plaintiff explained that his lupus causes "daily, achy pain in his elbows, hips and knees bilaterally." *Id.* And, although he denied pain at the time of the examination, "it is usually 10/10." *Id.* Plaintiff stated that his hepatitis C causes "fatigue, weakness, nausea," and constant, dull pain in his abdomen. R. 1042. He reported that eating small meals helps alleviate his pain. *Id.*

Dr. Bailey performed a neurological, musculoskeletal, and physical examination. R. 1043–45. The neurological examination revealed that plaintiff was alert, had fluent speech, good eye

contact, good concentration, appropriate mood, clear thought processes, his memory was normal, and he was orientated to time, place, person, and situation. R. 1043. Plaintiff's musculoskeletal examination revealed that he was able to carry and lift light objects, "squat and rise from that position with ease," rise from a sitting position without assistance, and had no difficulty getting up and down from the exam table. *Id.* Although plaintiff could tandem walk and stand, he could not hop on either foot bilaterally. *Id.* Plaintiff's physical examination also revealed nothing abnormal. R. 1044. Specifically, his range of motion was within the normal range, including his shoulder rotation. R. 1045.

Overall, Dr. Bailey concluded that plaintiff "can be expected to sit, stand and walk normally in an 8-hour workday with normal breaks." R. 1046. Plaintiff can also carry 20 pounds frequently and 30 pounds occasionally. *Id.* Dr. Bailey reported that plaintiff has "no limitations on bending, stooping, crouching, squatting, and so on and the [plaintiff] will be able to perform these frequently." *Id.* Plaintiff has no manipulative limitations on reaching, handling, feeling, grasping, fingering, pushing, or pulling. *Id.* Lastly, plaintiff has "no relevant visual, communicative or work place environmental limitations." *Id.*

**b. Psychological Evaluation—Karen M. Armstrong, Ph.D.**

Karen M. Armstrong, Ph.D., performed a psychological consultative examination on plaintiff on August 28, 2020. R. 1052–55. Plaintiff recounted much of his struggles with anxiety, depression, mood swings, and alcoholism. R. 1052–54. Plaintiff detailed that he had been on Zoloft for depression but did not find it helpful, but found gabapentin was effective in managing his cravings and pain. R. 1052. Plaintiff also took tramadol for pain and attended AA meetings. *Id.* Plaintiff reported that he was depressed and experiences significant mood swings but will only stay on "antidepressant medication for three months before stopping them." R. 1053. Plaintiff

discussed his hospital stays and denied receiving any mental health treatment after his hospital stay at Sentara Virginia Beach General Hospital. *Id.* He indicated that he used to cut himself but has not done so lately. R. 1054–55. Plaintiff discussed that he has a few friends that are neighbors that he talks to and goes shopping with weekly. R. 1054. He also reported that he does not sleep well and his appetite is poor. *Id.* Yet, plaintiff "is apparently managing the basics of his finances." *Id.*

Dr. Armstrong's mental status and behavioral observations outlined plaintiff's limitations due to mental health issues. She reported that he had a normal behavioral pace, had fair eye contact, was alert and oriented to all spheres, he could give general information such as the current president, and he had functional attention. R. 1054. But plaintiff had some difficulties with his memory. *Id.* Plaintiff could "register three words with immediate recall but only [recalled one] after several minutes." *Id.* Plaintiff also could not make change from $5.00 correctly or state at what temperature water boils. *Id.* However, plaintiff "did better with vocabulary definitions than with other verbal reasoning skills." *Id.* Plaintiff gave logical responses to comprehension questions, but he reminded the examiner that he is "crazy" and stated that he "hoped his correct answers did not disqualify him from being considered for disability." R. 1055. Dr. Armstrong noted that "plaintiff reported a history of poor judgment[,]" however, it was unclear whether "these reflect mental health issues, substance use issues, or a combination of factors." *Id.*

Dr. Armstrong reported that plaintiff's prognosis was "fair with sustained treatment and fair to guarded without treatment." *Id.* She stated that plaintiff seemed to have chronic depression and alcohol dependence and "his history suggested chronic dysfunctional patterns of behavior." *Id.* Dr. Armstrong stated that plaintiff is able to "understand basic instructions and perform at least simple and repetitive tasks" and could perform "moderately complex" tasks, but not "detailed

tasks." *Id.* Plaintiff can "attend work with at least fair and possibly adequate regularity"; and, although he sometimes calls out of work, Dr. Armstrong stated that it was unclear how much of his absenteeism reflects substance abuse. *Id.* Plaintiff can also tolerate supervision and respond appropriately, has "limited but adequate ability to interact with coworkers," and has "at least basic capacity for interaction with the public." *Id.* His stress tolerance is "well below average," and he seemed to have "periods of increased anxiety and depression that probably make vocational performance more challenging for him." *Id.* Dr. Armstrong stated that, because plaintiff has maintained work despite chronic difficulties, part-time competitive employment may be challenging but was not precluded. *Id.*

**3. State Agency Physician Review—September 2020 and February 2021**

In September 2020, state agency consultants Howard S. Leizer, Ph.D., and Bert Spetzler, M.D., reviewed plaintiff's medical record. R. 65–82. The initial disability determination found that plaintiff had severe impairments of dysfunction of his major joints and anxiety and obsessive-compulsive disorders. R. 74. Further, the state consultants found plaintiff's substance addiction disorders (alcohol) as non-severe. *Id.*

Dr. H. Leizer evaluated plaintiff under criteria 12.04 for depressive, bipolar, and related disorders and 12.08 for personality and impulse-control disorders. R. 74–75. He found plaintiff had moderate limitations in his ability to understand, remember, or apply information, interact with others, concentrate, persist, or maintain pace, and adapt or manage oneself. R. 75. Dr. H. Leizer explained that plaintiff can remember "only very familiar locations and very well learned and familiar work-like procedures." R. 79; R. 80 (noting that plaintiff is "able to perform only very familiar or extremely routine procedures"). Further, Dr. H. Leizer found that plaintiff is "able to

interact with the public only for brief periods or infrequently" and plaintiff "need(s) assistance in adapting to change, unless infrequent or implemented gradually." R. 80.

Dr. Spetzler evaluated plaintiff's physical impairments and concluded that plaintiff could occasionally lift or carry 50 pounds and could frequently lift or carry 25 pounds. R. 77. He also stated that plaintiff could stand or walk for 6 hours in an 8-hour workday and could sit for the same amount of time. *Id.* Dr. Spetzler added that plaintiff has a limited ability to push or pull due to "C-spine reduced" range of motion. *Id.* He rated plaintiff's postural limitations as follows: frequently climb ramps/stairs, stoop, kneel, crouch and crawl; occasionally climb ladders, ropes, and scaffolds; and unlimited balancing. R. 77–78. Dr. Spetzler found no manipulative, visual, communicative, or environmental limitations. R. 78. He also noted that plaintiff had a "medium RFC." *Id.*

In February 2021, Joseph Leizer, Ph.D., and David Bristow, M.D., reviewed plaintiff's medical record. R. 87–96. On reconsideration, the consultants found the same severe and non-severe impairments. R. 90. Dr. J. Leizer found plaintiff had mostly the same moderate limitations as Dr. H. Leizer and provided the same narrative explanations.[4] R. 91, 94–95. Dr. Bristow had the same findings as Dr. Spetzler. R. 93–94.

[4] The exceptions being that Dr. H. Leizer found plaintiff had moderate limitations in his ability to sustain an ordinary routine without special supervision and Dr. J. Leizer found no significant limitation, R. 79, 94, and Dr. J. Leizer found moderate limitation in plaintiff's ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness and Dr. H. Leizer found no significant limitation, R. 80, 95.

## III. THE ALJ'S DECISION

To evaluate plaintiff's claim of disability,[5] the ALJ followed the five-step analysis set forth in the SSA's regulations. *See* 20 C.F.R. §§ 404.1520(a). The ALJ considered whether plaintiff: (1) was engaged in substantial gainful activity; (2) had a severe impairment; (3) had an impairment that meets or medically equals a condition within the SSA's listing of official impairments; and (4) had an impairment that prevents him from performing any PRW in light of his RFC. R. 17–24.

The ALJ found that plaintiff met the insured requirements[6] of the Social Security Act through December 31, 2024, and had not engaged in substantial gainful activity from November 1, 2019, his alleged onset date of disability though the date of the decision. R. 17.

At steps two and three, the ALJ found that plaintiff had the following severe impairments: cervical spine stenosis status-post fusion and alcoholism. R. 17. The ALJ classified plaintiff's other physical impairments, specifically cubital canal syndrome, right shoulder partial tear, hepatitis C, and major depressive disorder, as non-severe because "they do not cause more than minimal effects on the claimant's ability to perform basic work activities." R. 18. The ALJ noted that plaintiff's mental impairments caused moderate limitation in the functional areas of

[5] To qualify for DIB, an individual must meet the insured status requirements of the Social Security Act, be under age 65, file an application, and be under a "disability" as defined in the Act. "Disability" is defined, for the purpose of obtaining disability benefits, "as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). To meet this definition, the claimant must have a "severe impairment" making it impossible to do previous work or any other substantial gainful activity that exists in the national economy. *Id.*

[6] In order to qualify for DIB, an individual must also establish a disability that commenced on or before the last day in which that individual met the insured status requirements of the Social Security Act. *See* 42 U.S.C. § 423(a), (c); 20 C.F.R. § 404.131(b).

understanding, remembering, applying information, and in concentrating, persisting, and maintaining pace. R. 19. And plaintiff has a mild limitation in the functional area of adapting and managing oneself and no limitation in interacting with others. *Id.* The ALJ determined that plaintiff's severe impairments, either singly or in combination (along with his other conditions), failed to meet or medically equal the severity of one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, as required for a finding of disability at step three. R. 18–20.

The ALJ next found that plaintiff possessed an RFC to perform light work, *see* 20 C.F.R. § 404.1567(b), "except with frequent climbing, crouching, crawling, stooping, and kneeling," subject to the limitations that he has "no exposure to ladders, ropes, or scaffolds, unprotected heights, hazardous machinery, or commercial driving." R. 20. The ALJ also found that plaintiff "is capable of simple, routine, and repetitive work." *Id.*

At step four, the ALJ found that plaintiff could perform PRW as a fast-foods worker as it is generally performed in the national economy because the work "does not require the performance of work-related activities precluded by the claimant's residual functional capacity." R. 24. Accordingly, the ALJ found that plaintiff was ineligible for benefits as he was not disabled from November 1, 2019, through the date of the decision, January 24, 2022. R. 24–25.

## IV. STANDARD OF REVIEW

In reviewing a Social Security disability decision, the Court is limited to determining whether the Commissioner applied the proper legal standard in evaluating the evidence and whether substantial evidence in the record supports the decision to deny benefits. 42 U.S.C. § 405(g); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401

(1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla of evidence[,] but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (noting the substantial evidence standard is "more than a mere scintilla," but "is not high").

When reviewing for substantial evidence, the Court does not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig*, 76 F.3d at 589. "'Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ).'" *Id.* (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)). The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed, unless the decision was reached by means of an improper standard or misapplication of the law. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987) (citing *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980)). Thus, reversing the denial of benefits is appropriate only if either (a) the record is devoid of substantial evidence supporting the ALJ's determination, or (b) the ALJ made an error of law. *See id.*

## V. ANALYSIS

***The ALJ failed to appropriately account for plaintiff's moderate limitation in concentrating, persisting, or maintaining pace in the RFC.***

Plaintiff argues that the ALJ, having found a moderate limitation[7] in concentrating, persisting, or maintaining pace ("CPP"), ignored plaintiff's mental limitations in determining plaintiff's RFC. Pl.'s Br. in Supp. Mot. Summ. J. ("Pl.'s Br."), ECF No. 10, at 8–10. Plaintiff

---

[7] Moderate limitation means the individual has fair ability to function "independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(F)(2)(c).

states "that the Fourth Circuit requires that when an ALJ finds '*moderate*' impairment in CPP, the RFC must include limits on pace." *Id.* at 8. However, plaintiff contends that there are two exceptions to this requirement: (1) "the ALJ provides an explicit and well-reasoned rationale for why he did not include limits on pace in the RFC," *id.* at 8–9 (citing *Shinaberry v. Saul*, 952 F.3d 113 (4th Cir. 2020)); or (2) "the RFC, while not explicitly addressing pace, includes other limitations that implicitly address pace," *id.* at 9 (citing *Sizemore v. Berryhill*, 878 F.3d 72 (4th Cir. 2017)). Plaintiff argues that neither exception applies because "[n]owhere in the ALJ's decision did she explain why she decided not to include any limits on pace," nor did the ALJ's RFC "include any other limitations that implicitly address pace." *Id.* at 9.

The Commissioner argues that the ALJ need not incorporate in the RFC the moderate limitation in CPP found at step three, Mem. Supp. Def.'s Mot. Summ. J. and in Opp'n Pl.'s Mot. Summ. J. ("Def.'s Mem."), ECF No. 12, at 13–20; rather, she states, a court "should consider whether it can meaningfully review the ALJ's findings on the claimant's ability to perform mental work-related functions," *id.* at 14 (citing *Shinaberry*, 952 F.3d at 121–22)). The Commissioner contends that the ALJ "sufficiently reviewed and discussed the record and reasonably accounted for Plaintiff's credibly established limitations." *Id.* at 16. Further, at step three, the Commissioner contends that "the ALJ explained that the evidence underlying that assessment was Plaintiff having some problems with concentration testing at his consultative examination . . . , and his reported difficulty concentrating when reading books and remembering what he read." *Id.* This same evidence was revisited "when explaining why Plaintiff was found capable of handling simple, routine, and repetitive work." *Id.* The Commissioner highlights that, when the ALJ explained additional limitation were unnecessary, the ALJ looked to plaintiff's functional abilities as stated in his examinations and unremarkable medical visits after August 2020. *Id.* at 17. The ALJ also

outlined plaintiff's positive response to medications, normal mental status findings, and his daily activities which showed "a certain level of mental prowess." *Id.* (quoting R. 22). The Commissioner also discussed the ALJ's finding that Dr. Armstrong, Dr. H. Leizer, and Dr. J. Leizer, were only "somewhat" or "slightly" persuasive. *Id.* at 18 (citing R. 23). Specifically, the ALJ "endorses" their finding that plaintiff is capable of simple, repetitive tasks, but disavowed "any limitations beyond that" because they "were 'inconsistent with the medical evidence in the file,' and not fully supported by the examination findings."[8] *Id.* (quoting R. 23). Having considered the parties' contentions, the Court finds that the ALJ has failed to satisfy requirements of *Mascio v. Colvin*, 780 F.3d 632 (4th Cir. 2015), for the reasons set forth below.

As part of the five-step sequential analysis, an ALJ must determine a claimant's residual functional capacity, or RFC. *See* 20 C.F.R. § 404.1545. The RFC is "the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting . . . 8 hours a day, for 5 days a week." Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *2 (July 2, 1996). An ALJ must assess a claimant's work-related abilities on a function-by-function basis. *Id.* at *3 (assessing physical, mental, and other abilities to perform work requirements based on limitations and impairments). After doing so, the ALJ may express the RFC in terms of both the exertional levels of work (sedentary, light, medium, heavy, and very heavy) and the nonexertional functions supported by the evidence. *Id.* In determining a claimant's RFC, the ALJ must consider all

[8] The Commissioner further highlights that plaintiff "fails to challenge the ALJ's finding that alcoholism was the main cause of Plaintiff's mental health symptoms." Def.'s Mem. 19. The ALJ found that alcoholism was the plaintiff's "only severe mental impairment." *Id.* This is important because "[t]he law is clear that a claimant who would otherwise qualify as disabled is not entitled to benefits if alcoholism . . . is a contributing factor material to the disability determination." *Id.* (citing *Sizemore*, 878 F.3d at 81). The ALJ found that, even with plaintiff's alcoholism, he was not disabled. *Id.* Thus, the Commissioner argues, even if the Court agrees that the ALJ's explanation was incomplete, this would be harmless error. *Id.* at 19–20.

relevant medical and other evidence in the record. 20 C.F.R. § 404.1545(a)(3).[9] The ALJ then uses the RFC to determine whether the claimant can perform his past relevant work (step four), and whether the claimant can adjust to any other work that exists in the national economy (step five). *Id.* § 404.1545(a)(5).

In conducting the RFC analysis, the Fourth Circuit has made clear that an ALJ must provide an adequate narrative discussion to allow for substantial evidence review. *See Thomas v. Berryhill*, 916 F.3d 307, 311–13 (4th Cir. 2019). In particular, the Fourth Circuit has found that an ALJ who finds that a claimant has a moderate limitation in CPP at step three must reconcile that finding with the RFC determination. *See Mascio*, 780 F.3d at 638. And, limiting the RFC to simple or routine tasks, or unskilled work does not account for limitations on pace. *Id.* ("[T]he ability to perform simple tasks differs from the ability to stay on task. Only the latter limitation would account for a claimant's limitation in concentration, persistence, or pace."). Accordingly, upon finding mental functional difficulties at step three, an ALJ must either: (a) include limitations in the RFC to account for the same; or (b) explain "why [the] moderate limitation in concentration, persistence, or pace at step three does not translate into a limitation in [the claimant's RFC]." *Id.*

When the ALJ chooses the latter path—explaining why the moderate limitation does not translate into a limitation in the RFC—the ALJ must engage in sufficient analysis and explanation for a court to meaningfully review those conclusions. *See Carol F. v. Saul*, No. 2:19cv155, 2020 WL 3966829, at *9 (E.D. Va. June 9, 2020), *report and recommendation adopted*, 2020 WL 3960579 (E.D. Va. July 13, 2020), *aff'd*, No. 20-1985, 2022 WL 1090254 (4th Cir. Apr. 12, 2022)

---

[9] "Other evidence" includes statements or reports from the claimant, the claimant's treating or nontreating sources, and others about the claimant's medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how impairments or symptoms affect the claimant's ability to work. 20 C.F.R. § 404.1529(a).

("[I]f an ALJ explains why moderate deficits in concentrating, persisting, or keeping pace do not necessitate additional limitations in a claimant's RFC, no remand is needed if the explanation adequately addresses why such deficits do not affect a claimant's ability to work.").

For example, in *Shinaberry v. Saul*, the Court found that the ALJ's review and discussion of the pertinent evidence—such as the state agency consultants' mental health assessments and consultative examination findings, as well as Shinaberry's adult function report—"sufficiently explained why the mental limitation to simple, routine, and repetitive tasks accounted for Shinaberry's borderline intellectual disability and her moderate limitations in . . . concentration, persistence[,] or pace." *Shinaberry*, 952 F.3d at 121–22. Specifically, the Court highlighted that the ALJ considered "Shinaberry's lifelong, borderline intellectual disability" and Shinaberry's statements that "she does not know how long she can pay attention, sometimes finishes what she starts, and follows spoken instructions not the best" and then "explained why the psychological evidence and Shinaberry's statements support a mental limitation to simple, routine, and repetitive tasks." *Id.* at 122.

Comparatively, in *Ollis v. Berryhill* the Court found that the ALJ did not provide an adequate explanation about why the RFC did not include moderate limitations in CPP; therefore, the requirements of *Mascio* were not met. *Ollis v. Berryhill*, No. 2:17cv33, 2017 WL 7167171 (E.D. Va. Dec. 18, 2017), *report and recommendation adopted*, 2018 WL 627386 (E.D. Va. Jan. 30, 2018). In *Ollis*, at steps two and three, the ALJ noted Ollis's longstanding mental health impairments and found that he had moderate problems in CPP. *Id.* at *13. The ALJ then sought to "counterbalance" these impairments by noting "other, more favorable, findings relative to Ollis's mental state." *Id.* However, the Court found that although there were "more favorable" findings relative to Ollis's mental state, such findings do "not preclude the existence of the negative

functional limitations which the ALJ found established by the record." *Id.* at *13 (concluding that "the favorable mental status observations are, in and of themselves, insufficient to explain whether Ollis could work full-time on a weekly basis"). The ALJ also relied upon the state agency psychologists' conclusion that Ollis was "capable of completing simple tasks in a work setting where a great deal of interpersonal interaction is not required." *Id.* at *14. But the ALJ "nowhere recited, discussed, or explained how he reconciled their (and his own) conclusions about Ollis's problems in concentrating, persisting, and keeping pace throughout the work week." *Id.* Therefore, the Court found that "the reasons offered in support of the ALJ's ruling are inadequate" to address Ollis's moderate limitations in CPP. *Id.*

Here, at step three of the analysis, the ALJ found that plaintiff had "moderate limitations" in CPP due to his mental functioning. R. 19. Citing to hearing testimony and Dr. Armstrong's psychological evaluation, the ALJ noted that plaintiff had some problems completing serial 7's, could not make change for $5.00, and that plaintiff testified that "he sometimes had problems while reading books and remembering what he read." *Id.*

At step four, as part of the ALJ's overall RFC assessment, the ALJ discussed and considered medical and other evidence in the record, including: (1) plaintiff's symptoms; (2) his hearing testimony; (3) his physical and mental health conditions, including treatment; (4) the response of his conditions to medication and treatment; (5) his daily activities and hobbies; (6) medical opinions of the state agency consultants; and (7) findings from the consultative examinations. R. 20–24. However, notwithstanding the ALJ's finding that plaintiff had moderate limitations in CPP, the only mental limitation the ALJ included in the RFC was that plaintiff could perform only "simple, routine, and repetitive work." R. 20. As already noted, such a limitation is not a CPP limitation. *See Mascio*, 780 F.3d at 638. Therefore, to satisfy *Mascio*, the ALJ needed

to explain why the moderate limitation in CPP found at step three did not translate into a limitation in the RFC.

To start, in analyzing the medical opinion evidence, the ALJ ignored critical, contrary evidence provided by Dr. Armstrong that is pertinent to assessing plaintiff's ability to concentrate, persist, and maintain pace. *See Mascio*, 780 F.3d at 636–37 (remanding and finding the ALJ's lack of analysis "especially troubling" due to unaddressed, conflicting record evidence on the claimant's RFC). Importantly, Dr. Armstrong was the only mental health provider that examined plaintiff and provided an opinion about his limitations.[10] In Dr. Armstrong's evaluation, she found that plaintiff can "understand basic instructions and perform at least simple and repetitive tasks" and could perform "moderately complex tasks" but not "detailed tasks." R. 1055. She also found that plaintiff can "attend work with at least fair and possibly adequate regularity." *Id.* Critically, however, Dr. Armstrong concluded that "*part-time* competitive employment may be challenging for [plaintiff] at this time but is not precluded." R. 1055 (emphasis added). In finding Dr. Armstrong's opinion to be "somewhat persuasive," the ALJ only addresses her disagreement with Dr. Armstrong's assessment of plaintiff's low stress tolerance. R. 23. In the ALJ's opinion, she repeatedly states that during Dr. Armstrong's assessment plaintiff could recall 3/3 objects immediately but only 1/3 objects after five minutes, his behavior was normal, and that he could complete some serial 7's successfully. R. 21 (citing R. 1052–56), 23. Apparently based partly on such findings, the ALJ accepted Dr. Armstrong's findings that plaintiff could perform "simple and

[10] Plaintiff was treated for his alcoholism at the hospital and at a psychiatric center, R. 483–96, 833–85, 1013–19, and received medication management for his mental health symptoms from Dr. Werwath, R. 1059–70, 1150–51, 1236–46, but none of these providers provided any opinions about plaintiff's functional capacity in relation to his mental health impairments.

repetitive tasks," but ignored Dr. Armstrong's additional finding that "part-time competitive employment may be challenging for [plaintiff] at this time but is not precluded." R. 1055.

Moreover, as in *Ollis*, the ALJ "nowhere recited, discussed, or explained" how she reconciled the state agency consultants' (and her own) conclusion that plaintiff has moderate limitations in CPP and yet needs no pace-related limitations. The ALJ relied upon the state agency consultants' conclusion that plaintiff was "able to perform only very familiar or extremely routine procedures" when fashioning the RFC. R. 80; Def.'s Mem. 18 ("The ALJ endorsed these consultants' findings that Plaintiff was 'capable of simple, repetitive tasks' and otherwise 'capable of simple work.'"). But this limitation does not adequately address CPP or the state agency findings about plaintiff's CPP limitations. Notably, in the category of "concentration and persistence limitations," Dr. H. Leizer noted that plaintiff was "moderately limited" in his ability to perform the following: (1) carry out detailed instruction; (2) maintain attention and concentration for extended periods; (3) perform activities within a schedule, maintain regular attendance, and be punctual within customer tolerances; (4) sustain an ordinary routine without special supervision; (5) work in coordination with or in proximity to others without being distracted by them; and (6) complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. R. 79. In a narrative following these ratings, Dr. H. Leizer stated that plaintiff is "able to perform only very familiar or extremely routine procedures." R. 80. The ALJ's decision does not resolve the inconsistency in finding that plaintiff has moderate limitation in CPP, but can persist and perform at a normal pace throughout the work week. This is troubling because the VE testified that, in order to maintain employment as a fast-foods worker,

a person could not be off task more than ten percent cumulatively and would be limited to no more than six absences per year. R. 62.

The ALJ appears to try and counterbalance plaintiff's mental impairments by noting more favorable findings relative to plaintiff's mental state. The ALJ attempts to explain her conclusion that "limitations beyond the residual functional capacity are not warranted." R. 21. The ALJ noted that, although plaintiff struggled with memory and concentration while reading and had a flat and sad affect with some fleeting suicidal ideations in May 2020, *id.* (citing R.833–80), he had normal memory, good concentration, and he was fully oriented in all spheres during Dr. Bailey's[11] physical consultative examination, *id.* (citing R. 1041–48). She also notes that a physical exam in December 2020 revealed that plaintiff's recent and remote memory were normal, and he was alert and oriented in all spheres. R. 22 (citing R. 1157–60). She also underscored that treatment notes from May 2021 had similar findings and noted that plaintiff had good judgment and a normal mood and affect. *Id.* Further, the ALJ found that plaintiff "was able to sufficiently relay information about his past relevant work, activities of daily living, and medical treatment." *Id.*

Few of these positive findings bear on plaintiff's CPP abilities. For example, having a normal mood and affect and good judgment, and being oriented and alert and able to relay information during the hearing, have little to nothing to do with plaintiff's ability to work full-time without CPP limitations. *See Ollis*, 2017 WL 7167171, at *13 (noting that these "favorable mental status observations are, in and of themselves, insufficient to explain whether [plaintiff] could work full-time on a weekly basis" given that the ALJ found functional limitations were established by the record). Nor did the ALJ explain how these positive findings establish that plaintiff is "capable

---

[11] Later in the ALJ's opinion, she mistakenly names Dr. Li when it was Dr. Bailey that performed the August 2020 consultative exam. *Compare* R. 24 (Dr. Li), *with* R. 1046 (Leo M. Bailey II, D.O.).

of full time work without an accommodation directed to the pace of that work." *Courtney L. v. Saul*, No. 2:20cv174, 2021 WL 2046712, at *10 (E.D. Va. May 5, 2021), *report and recommendation adopted*, 2021 WL 2042462 (E.D. Va. May 21, 2021). In other words, the link between the ALJ's discussion of the medical evidence and the RFC's omission of moderate limitations in CPP is absent from the ALJ's analysis. *See id.* at *9.

Much the same is true for the ALJ's finding that plaintiff's activities of daily living are "suggestive of an individual who is capable of a certain level of mental prowess, physical capabilities, and overall motivation necessary for certain types of work." R. 22. Such findings fail to sufficiently describe why the ALJ concluded that plaintiff could work full-time, without need of additional RFC limitations. Plaintiff's ability to attend to his personal care needs independently, drive himself short distances, and live alone without significant issue, *id.*, have little, if anything, to do with plaintiff's ability to persist and maintain pace during the work week. In fact, Dr. Armstrong reached her opinion regarding plaintiff's limited ability to work, with full knowledge of plaintiff's daily activities. R. 1052–55.

Thus, the Court is in a situation not unlike that encountered by the Fourth Circuit in *Mascio*. Specifically, the reasons offered in support of the ALJ's ruling are inadequate to address the mental functional limitations at issue. Also, the absence of an explanation frustrates judicial review and leaves the Court to speculate about why the ALJ did not include the very mental functional limitations she identified in step three when fashioning the RFC and questioning the VE. For these reasons, the Court cannot conclude that the ALJ's RFC determination is supported by substantial evidence. A remand is necessary for the ALJ to explain whether and how plaintiff could perform

light work despite his moderate mental functional limitations, and to do so in a way that is reviewable by the Court.[12]

## VI. RECOMMENDATION

For the foregoing reasons, the Court recommends that: (a) plaintiff's motion for summary judgment (ECF No. 9) be **GRANTED**; (b) the Commissioner's motion for summary judgment (ECF No. 11) be **DENIED**; and (c) the case **REMANDED** to the Commissioner for further proceedings. On remand, the ALJ should explain whether and how plaintiff could perform light work despite his moderate mental functional limitations in a way that is reviewable by the Court. The ALJ should also reexamine the correct classification of plaintiff's PRW and should assess plaintiff's subjective complaints regarding his depression in light of *Shelley C. v. Comm'r of Soc. Sec. Admin.*, 61 F.4th 341 (4th Cir. 2023).

## VII. REVIEW PROCEDURE

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date this report is forwarded to the objecting party by Notice of Electronic Filing or mail, *see* 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. Rule 6(d) of

[12] The Court is also not persuaded by the Commissioner's argument that regardless of the ALJ's failure to comply with *Mascio*, the Court "may 'nonetheless' affirm because those limitations would be due to alcoholism and could not result in a different outcome." Def.'s Mem. 19–20 (citing *Sizemore*, 878 F.3d at 81). Notably, the ALJ did not reach this question. Moreover, unlike in *Sizemore*, the ALJ did not identify substantial record evidence indicating that plaintiff's functioning would increase substantially if he stopped drinking. *See Sizemore*, 878 F.3d at 81. Therefore, it is unclear whether a disability finding would be precluded by plaintiff's alcoholism. *See id.*; 42 U.S.C. §§ 423(d)(2)(C), 1382c(a)(3)(J).

the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail. A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof. *See* Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2. A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

/s/
Robert J. Krask
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
August 14, 2023